Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
E-mail: michael@lozeaudrury.com
         doug@lozeaudrury.com
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205

Colin A. Kelly (State Bar No. 266956)
E-mail: colin@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Ave., Suite F-110
Costa Mesa, CA 92626
Tel: (714) 850-1965
Fax: (714) 850-1592

Attorneys for Plaintiff
ORANGE COUNTY COASTKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BRISTOL INDUSTRIES, LLC, a Delaware corporation,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

1

ORANGE COUNTY COASTKEEPER ("OCC"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On January 9, 2017, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of OCC's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

5.     This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 630 East Lambert Road in Brea, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.     Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.    PARTIES

### Orange County Coastkeeper

8.     Plaintiff OCC is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Costa Mesa, California.

COMPLAINT                                                3

Founded in 1999, OCC has approximately two thousand members who live and/or recreate in and around the Orange County area.  OCC is dedicated to protecting and promoting water resources that are swimmable, drinkable, fishable, and sustainable.  To further this mission, OCC actively seeks federal and state implementation of the Clean Water Act.  Where necessary, OCC directly initiates enforcement actions on behalf of itself and its members.

9.     OCC has members living in the community adjacent to the Facility and the San Gabriel River Watershed.  They enjoy using the San Gabriel River for recreation and other activities.  Members of OCC use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of OCC use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of OCC's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10.     OCC brings this action on behalf of its members.  OCC's interest in reducing Defendant's discharges of pollutants into the San Gabriel River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of OCC.

11.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

COMPLAINT                                    4

**Owners and/or Operators of Bristol Facility**

12.    OCC is informed and believes, and therefore alleges, Defendant BRISTOL INDUSTRIES, LLC ("Bristol") is a corporation formed under the laws of the State of Delaware.

13.    OCC is informed and believes, and thereon alleges, Bristol is an owner of the Facility.

14.    OCC is informed and believes, and thereon alleges, Bristol is an operator of the Facility.

15.    Collectively, OCC refers to Bristol as the Facility's "Owners and/or Operators."

16.    OCC is informed and believes, and thereon alleges, Bristol manufactures internal threaded fasteners for aerospace and aircraft applications.

17.    OCC is informed and believes, and thereon alleges, the registered agent for service of process for Bristol is CSC – Lawyers Incorporating Service, (Entity Number 201408710046), 2710 Gateway Oaks Dr., Suite 150N, Sacramento, CA 95833.

## IV.   STATUTORY BACKGROUND

### Clean Water Act

18.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1311(a) and 1342(b).

19.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual

COMPLAINT

permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

20.  Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

### General Permit

21.  The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

22.  In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

23.  The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997

COMPLAINT

Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

24.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

25.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* 1997 Permit, § A(2); 2015 Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as

COMPLAINT

1  necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or

2  implement an adequate SWPPP, or update or revise an existing SWPPP as required, is

3  a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

4       26.    Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a

5  SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention

6  team; a site map; a list of significant materials handled and stored at the site; a

7  description of potential pollutant sources; an assessment of potential pollutant sources;

8  and a description of the BMPs to be implemented at the facility that will reduce or

9  prevent pollutants in storm water discharges and authorized non-storm water

10  discharges, including structural BMPs where non-structural BMPs are not effective.

11  Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP

12  requirements as the 1997 Permit, except that all dischargers are now required to

13  develop and implement a set of minimum BMPs, as well as any advanced BMPs as

14  necessary to achieve BAT/BCT, which serve as the basis for compliance with the

15  2015 Permit's technology-based effluent limitations and receiving water limitations.

16  See 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive

17  assessment of potential pollutant sources than the 1997 Permit; more specific BMP

18  descriptions; and an additional BMP summary table identifying each identified area of

19  industrial activity, the associated industrial pollutant sources, the industrial pollutants,

20  and the BMPs being implemented.  See 2015 Permit, §§ X(G)(2), (4), (5).  Section

21  X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm

22  water discharge locations.

23

24       27.    The 2015 Permit requires dischargers to implement and maintain, to the

25  extent feasible, all of the following minimum BMPs in order to reduce or prevent

26  pollutants in industrial storm water discharges: good housekeeping, preventive

27  maintenance, spill and leak prevention and response, material handling and waste

28  management, erosion and sediment controls, an employee training program, and

COMPLAINT                                    8

quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table.  *See* 2015 Permit, § X(H)(4), (5).

28.  The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

29.  Under the 1997 Permit, facilities must analyze storm water samples for

COMPLAINT                                                    9

"toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  2015 Permit, § XI(B)(6)(c).

30.     Under the 2015 Permit, a facility must analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix."  2015 Permit, § XI(B)(6)(d).

31.      Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

32.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

33.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

34.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information

COMPLAINT                                                   10

submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  *See* 2015 Permit, § XV.

35.    The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plans**

36.    The Regional Board has identified beneficial uses and established water quality standards for the Coyote Creek and its tributaries in the "Water Quality Control Plan for the Santa Ana River Basin (Region 8), 3rd Ed., (Rev. June 2011)" generally referred to as the Basin Plan.

37.    The beneficial uses of these waters include municipal and domestic supply, water contact recreation, non-contact water recreation, wildlife habitat, and warm freshwater habitat.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Contact recreation use includes fishing and wading.

38.    Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge in violation of the Storm Water Permit.

39.    The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic

COMPLAINT                                              11

resources to levels which are harmful to human health."

40.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses."

41.    The Basin Plan includes a narrative suspended and settleable solids standard which states that "[i]nland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses...."

42.    The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."

43.    The Basin Plan contains a narrative floatables standard which states that '[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses."

44.    The Basin Plan contains a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses."

45.    The Los Angeles Regional Water Quality Control Board has identified beneficial uses of the San Gabriel River, and the San Gabriel River Estuary and Alamitos Bay and established water quality standards for these waters in the "Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties" ("Los Angeles Basin Plan").  This Los Angeles Basin Plan would be applicable to Coyote Creek once it flows past the hydrologic boundary between Region 8, the Santa Ana Region, and Region 4, the Los Angeles Region.

46.    In addition, EPA has promulgated water quality standards for toxic pollutants in all California waterbodies ("California Toxics Rule"), which apply to the

COMPLAINT                                                    12

Receiving Waters, unless superseded by the Basin Plan. 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

47.     The California Toxics Rule adopted for freshwater numeric water quality standards are: zinc - 0.120 mg/L (Criteria Maximum Concentration – "CMC"); copper - 0.013 mg/L (CMC); lead - 0.065 mg/L (CMC); cadmium - 0.0043 mg/L (CMC); silver - 0.0034 mg/L (CMC); and nickel - 0.47 mg/L (CMC). *Id.*

48.     The California Toxics Rule includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000).

49.     Discharges with pollutant levels in excess of the California Toxics Rule criteria, the Basin Plan, and/or other applicable water quality standards are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

50.     Surface waters that cannot support beneficial uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.  According to the latest 303(d) List of Water Quality Limited Segments, Coyote Creek is impaired for ammonia, dissolved copper, lead, toxicity, and pH, among other pollutants.  See http://www.waterboards.ca.gov/water_issues/ programs/tmdl/integrated2012.shtml.  Reach 1 of the San Gabriel River, where Coyote Creek flows into the San Gabriel River, is listed as impaired for impaired for coliform bacteria and pH.  The San Gabriel River Estuary is impaired for copper and nickel, among other pollutants.

51.     EPA has established Parameter Benchmark Values as objective guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from

COMPLAINT                                    13

Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (July 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.     These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; aluminum – 0.75 mg/L; cadmium – 0.0053 mg/L; nitrate + nitrite as nitrogen ("N+N") – 0.68 mg/L; lead – 0.262 mg/L; zinc – 0.26 mg/L; iron – 1.0 mg/L; copper – 0.0332 mg/L; silver – 0.0183 mg/L; and nickel – 1.02 mg/L.

53.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived from these benchmarks.  2015 Permit, Section I(M) (Finding 62).  During the public comment period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations."  State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit, Section I(M) (Finding 63).

54.     The 2015 Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; aluminum – 0.75 mg/L; N+N – 0.68 mg/L; zinc – 0.26 mg/L; and iron – 1.0 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more

COMPLAINT                                        14

analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

55.    Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the Storm Water Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

56.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $51,570 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011 up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    STATEMENT OF FACTS

57.    OCC is informed and believes, and thereon alleges, that the Facility is comprised of an 18 acre industrial site located near the intersection of Oak Street and Lambert Road in the City of Brea.

COMPLAINT                                    15

58.     The Facility falls within Standard Industrial Classification ("SIC") codes 3452 (Bolts, Nuts, Screws, Rivets and Washers), and 3471 (Electroplating, Plating, Polishing, Anodizing, and Coloring).

59.     OCC is informed and believes, and thereon alleges, the Facility is primarily engaged in the manufacturing of internal threaded fasteners for aerospace and aircraft applications.

60.     OCC is informed and believes, and thereon alleges, that the Facility is comprised of and contains, among other areas and materials, manufacturing building(s), oil and fuel tank storage areas, fueling areas, hazardous waste storage areas, raw material loading and unloading areas, bulk material stockpiling areas, raw metal storage areas, parking areas, oil barrels, leaking scrap metal bins and dumpsters, other garbage bins/cans, oil and coolant storage and disposal areas, fluid draining areas, cooling towers, chemical tanks and storage areas, other tanks, driveway areas, shipping and receiving areas, on-site material handling equipment such as conveyors, forklifts, and trucks, manufacturing equipment wash and maintenance areas, a wastewater and oil treatment system, areas for broken or offline manufacturing and other machinery, and various pieces of heavy equipment employed for a variety of purposes.

61.     On information and belief, OCC alleges that the industrial processes that occur at the Facility include, among other things, abrasive blasting, air compression, heat treatment and chemical processes, and scrap metal storage.

62.     Based on OCC's investigation, including a review of the Facility's NOIs, SWPPP, aerial photography, and OCC's information and belief, storm water is collected via surface flows and discharged from the Facility via at least two outfalls into channels that discharge into channels that flow into either the Brea Creek Channel or Fullerton Creek, which both flow into Coyote Creek, which flows into Reach 1 of the San Gabriel River, and ultimately flows to the Pacific Ocean via the

COMPLAINT

1    San Gabriel River Estuary and Alamitos Bay.

2        63.    Plaintiff is informed and believes, and thereupon alleges that the storm

3    water flows over the surface of the Facility where industrial activities occur and areas

4    where airborne materials associated with the industrial processes at the Facility may

5    settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that

6    storm water flowing over these areas collects suspended sediment, dirt, metals, and

7    other pollutants as it flows towards the storm water discharge locations.

8        64.    On information and belief, Plaintiff alleges that the majority of storm

9    water discharges from the Facility contain storm water that is commingled with runoff

10   from areas at the Facility where industrial processes occur.

11       65.    On information and belief, OCC alleges that there are insufficient

12   structural storm water control measures installed at the Facility.  Plaintiff is informed

13   and believes, and thereupon alleges, that the management practices at the Facility are

14   currently inadequate to prevent the sources of contamination described above from

15   causing the discharge of pollutants to waters of the United States.  The Facility lacks

16   sufficient structural controls such as grading, berming, roofing, containment, or

17   drainage structures to prevent rainfall and storm water flows from coming into contact

18   with exposed areas of contaminants.  The Facility lacks sufficient structural controls

19   to prevent the discharge of water once contaminated.  The Facility lacks adequate

20   storm water pollution treatment technologies to treat storm water once contaminated.

21

22       66.    Since at least January 15, 2012, Defendant has taken samples or arranged

23   for samples to be taken of storm water discharges at the Facility.  The sample results

24   were reported in the Facility's Annual Reports submitted to the Regional Board.

25   Defendant certified each of those Annual Reports pursuant to the General Permit.

26       67.    In Annual Reports and storm water sampling results submitted to the

27   Regional Board for the past five years, the Facility has consistently reported high

28   pollutant levels from its storm water sampling results.

COMPLAINT                                17

68.     The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan.  These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

69.     The Facility has reported violations of the narrative water quality standards for silt, floating and suspended particulate, and oil sheen contained in the Basin Plan.  Discharges that violated at least one of these standards occurred on the following dates: December 12, 2014; February 27, 2014; May 6, 2013; March 8, 2013; January 24, 2013; and December 12, 2014.

70.     The levels of cadmium in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.0043 mg/L for cadmium (CMC).  For example, on September 15, 2015, the level of cadmium measured from one of the Facility's storm water outfalls was 3.4 mg/L. That level of cadmium is over 790 times the CMC for cadmium.  Defendant also has measured levels of cadmium in storm water discharged from the Facility in excess of 0.0043 mg/L in nearly every storm water discharge from the Facility for the past five years, including January 19, 2017; January 9, 2017; December 16, 2016; March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; December 12, 2012; and March 17, 2012.

71.     The levels of cadmium in storm water detected by the Facility have exceeded the benchmark value and annual NAL for cadmium of 0.0053 mg/L established by EPA and the State Board, respectively.  For example, on September 15, 2015, the level of cadmium measured from one of the Facility's storm water outfalls

COMPLAINT                                              18

was 3.4 mg/L.  That level of cadmium is over 641 times the benchmark value and annual NAL for cadmium.  Defendant also has measured levels of cadmium in storm water discharged from the Facility in excess of 0.0053 mg/L in nearly every storm water discharge from the Facility for the past years, including January 19, 2017; January 9, 2017; December 16, 2016; March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; December 12, 2012; and March 17, 2012.

72.     The levels of copper in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.013 mg/L for copper (CMC).  For example, on September 15, 2015, the level of copper measured from one of the Facility's storm water outfalls was 1.8 mg/L.  That level of copper is over 138 times the CMC for copper.  Defendant also has measured levels of copper in storm water discharged from the Facility in excess of 0.013 mg/L in nearly every storm water discharge from the Facility for the past years, including January 19, 2017; January 9, 2017; December 16, 2016; March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; December 12, 2012; and March 17, 2012.

73.     The levels of copper in storm water detected by the Facility have exceeded the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively.  For example, on September 15, 2015, the level of copper measured from one of the Facility's storm water outfalls was 1.8 mg/L.  That level of copper is over 54 times the benchmark value and annual NAL for copper.  Defendant also has measured levels of copper in storm water discharged from the Facility in excess of 0.0332 mg/L on January 19, 2017; March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; and March 17, 2012.

74.     The levels of silver in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.0043 mg/L

COMPLAINT                                          19

for silver (CMC). For example, on September 15, 2015, the level of silver measured from one of the Facility's storm water outfalls was 0.74 mg/L. That level of silver is over 172 times the CMC for silver. Defendant also has measured levels of silver in storm water discharged from the Facility in excess of 0.0043 mg/L on January 19, 2017; January 9, 2017; December 16, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; and March 17, 2012.

75. The levels of silver in storm water detected by the Facility have exceeded the benchmark value and annual NAL for silver of 0.0183 mg/L established by EPA and the State Board, respectively. For example, on September 15, 2015, the level of silver measured from one of the Facility's storm water outfalls was 0.74 mg/L. That level of silver is over 40 times the benchmark value and annual NAL for silver. Defendant also has measured levels of silver in storm water discharged from the Facility in excess of 0.0332 mg/L on March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; and March 17, 2012.

76. The levels of zinc in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.12 mg/L for zinc (CMC). For example, on September 15, 2015, the level of zinc measured from one of the Facility's storm water outfalls was 6.7 mg/L. That level of zinc is almost 56 times the CMC for zinc. Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.12 mg/L on January 19, 2017; March 11, 2016; January 5, 2016; December 12, 2014; February 27, 2014; January 24, 2013; and March 17, 2012.

77. The levels of zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively. For example, on September 15, 2015, the level of zinc measured from one of the Facility's storm water outfalls was 6.7 mg/L. That level of zinc is almost 26 times the benchmark value and annual NAL for zinc. Defendant

COMPLAINT                                              20

also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L on March 11, 2016; January 5, 2016; December 12, 2014; January 24, 2013; and March 17, 2012.

78.     The levels of N+N in storm water detected by the Facility have exceeded the benchmark value and annual NAL for N+N of 0.68 mg/L established by EPA and the State Board, respectively.  For example, on March 11, 2016, the level of N+N measured by Defendant from one of the Facility's outfalls was 2.1 mg/L.  That level of N+N is over 3 times the benchmark value and annual NAL for N+N.  Defendant also has measured levels of N+N in storm water discharged from the Facility in excess of 0.68 mg/L on January 19, 2017; September 15, 2015; December 12, 2014; January 24, 2013; and March 17, 2012.

79.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively.  For example, on December 12, 2014, the level of TSS measured by Defendant at one of the Facility's outfalls was 2,360 mg/L.  That level of TSS is almost 24 times the benchmark value and annual NAL for TSS.  Defendant also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on March 11, 2016; September 15, 2015; February 27, 2014; and March 17, 2012.

80.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on September 15, 2015, the level of aluminum measured by Defendant from one of the Facility's outfalls was 16 mg/L.  That level of aluminum is over 21 times the benchmark value and annual NAL for aluminum.  Defendant also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on January 5, 2016; December 12, 2014; February 27, 2014; December 12, 2012; and March 17, 2012.

COMPLAINT

81.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1.0 mg/L established by EPA and the State Board, respectively.  For example, on December 12, 2014, the level of iron measured by Defendant from one of the Facility's outfalls was 100 mg/L.  That level of iron is 100 times the benchmark value and annual NAL for iron.  Defendant also has measured levels of iron in storm water discharged from the Facility in excess of 1.0 mg/L on March 11, 2016; January 5, 2016; September 15, 2015; February 27, 2014; and March 17, 2012.

82.     The levels of nickel in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.47 mg/L for nickel (CMC).  For example, on September 15, 2015, the level of nickel measured from one of the Facility's storm water outfalls was 3 mg/L.  That level of nickel is over 6 times the CMC for nickel.  Defendant also has measured levels of nickel in storm water discharged from the Facility in excess of 0.47 mg/L on December 12, 2014; and February 27, 2014.

83.     The levels of nickel in storm water detected by the Facility have exceeded the benchmark value and annual NAL for nickel of 1.02 mg/L established by EPA and the State Board, respectively.  For example, on September 15, 2015, the level of nickel measured from one of the Facility's storm water outfalls was 3 mg/L. That level of nickel is almost 3 times the benchmark value and annual NAL for nickel. Defendant also has measured levels of nickel in storm water discharged from the Facility in excess of 1.02 mg/L on December 12, 2014; and February 27, 2014.

84.     The levels of lead in storm water detected by the Facility have exceeded the benchmark value and annual NAL for lead of 0.065 mg/L established by EPA and the State Board, respectively.  For example, on December 12, 2014, the level of lead measured from one of the Facility's storm water outfalls was 0.69 mg/L.  That level of lead is over 10 times the benchmark value and annual NAL for lead.  Defendant also

COMPLAINT                                            22

has measured levels of lead in storm water discharged from the Facility in excess of 0.065 mg/L on September 15, 2015; and February 27, 2014.

85.     On information and belief, OCC alleges that hexavalent chromium is a pollutant likely to be present in Bristol's storm water discharges in significant quantities.  On information and belief, OCC alleges that Bristol has never analyzed its storm water discharges for hexavalent chromium.

86.     On information and belief, OCC alleges that Bristol has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Facility.

87.     On information and belief, Plaintiff alleges that since at least January 15, 2012, Defendant has failed to implement BAT and BCT at the Facility for its discharges of cadmium, copper, silver, zinc, N+N, TSS, aluminum, iron, nickel, and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

88.     On information and belief, Plaintiff alleges that since at least January 15, 2012, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT.

COMPLAINT                                   23

According to information available to OCC, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

89.     Information available to OCC indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into channels that flow into either the Brea Creek Channel or Fullerton Creek, which both flow into Coyote Creek, which flows into Reach 1 of the San Gabriel River, and ultimately flows to the Pacific Ocean via the San Gabriel River Estuary and Alamitos Bay.

90.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

91.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
#### Failure to Implement the Best Available and Best Conventional Treatment Technologies
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

92.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

93.     The General Permit's SWPPP requirements and Effluent Limitation B(3)

COMPLAINT                                         24

of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of cadmium, copper, silver, zinc, N+N, TSS, aluminum, iron, nickel, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

94.    OCC is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the Clean Water Act. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

95.    Each day since January 15, 2012, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

96.    OCC is informed and believes, and thereon alleges, the Defendant's violations of Effluent Limitations in the Storm Water Permit and Clean Water Act are ongoing and continuous.

97.    Defendant has been in violation of the BAT/BCT requirements every day since January 15, 2012.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT                                     25

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

98.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

99.   Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

100.   Plaintiff is informed and believes, and thereon alleges, that since at least January 15, 2012, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for cadmium, lead, zinc, copper, silver, nickel, as well as narrative water quality standards in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

101.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with metals, sediment, oil, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows into channels that flow into either the Brea Creek Channel or Fullerton Creek, which both

COMPLAINT                                    26

flow into Coyote Creek, which flows into Reach 1 of the San Gabriel River, and ultimately flows to the Pacific Ocean via the San Gabriel River Estuary and Alamitos Bay.

102.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

103.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

104.   Every day since at least January 15, 2012, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

105.   Plaintiff is informed and believes, and thereon alleges, Defendant's violations of Receiving Water Limitations and Discharge Prohibitions of the Storm Water Permit and Clean Water Act are ongoing and continuous.

WHEREFORE, Plaintiff prays for judgement against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

106.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

107.   The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than

COMPLAINT                                        27

October 1, 1992.

108.   Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

109.   Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

110.   Each day since January 15, 2012, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

111.   Defendant has been in violation of the SWPPP requirements every day since January 15, 2012.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to adequately develop, implement, and/or revise an adequate SWPPP for the Facility.

WHEREFORE, Plaintiff prays for judgement against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

113.   The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

114.   Plaintiff is informed and believes, and thereon alleges, Defendant has failed and continues to fail to develop and implement an adequate monitoring and

COMPLAINT                                    28

reporting program for the Facility, in violation of the Storm Water Permit.

115.   Plaintiff is informed and believes, and thereon alleges, Defendant has failed and continues to fail to adequately revise an adequate monitoring and reporting program for the Facility, in violation of the Storm Water Permit.

116.   Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to analyze its storm water discharges for hexavalent chromium.

117.   Each day since at least January 15, 2012, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

118.   The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

119.   Defendant will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the Clean Water Act each and every day they fail to adequately develop, implement, and/or revise a monitoring and reporting plan for the Facility.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

120.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

COMPLAINT                                              29

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4 (2009);

j.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.  Award any such other and further relief as this Court may deem appropriate.

COMPLAINT                                                30

1

2   Dated: March 16, 2017                    Respectfully submitted,

3
                                     By:    _/s/ Douglas J. Chermak_____
4                                           Douglas J. Chermak
5                                           LOZEAU DRURY LLP
                                            Attorneys for Orange County Coastkeeper
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              31